UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

TRACY ROBERSON,                           )
                                          )
            Petitioner,                   )
                                          )
v.                                        )        No.    3:21-CV-305-TAV-JEM
                                          )
BRIAN ELLER,                              )
                                          )
            Respondent.                   )

## MEMORANDUM OPINION

After Petitioner entered a home where the victim was house sitting, repeatedly hit the victim with a hard object, told the victim he had guns, used duct tape to bind the victim's arms and legs, removed a safe from the home, raped the victim vaginally and anally, and left the victim bound in the room before coming back to take the victim's money, car keys, and car, he was convicted of aggravated burglary, especially aggravated kidnapping, aggravated robbery, two counts of aggravated rape, theft of property valued over $1,000, and theft of property valued over $10,000. *State v. Roberson*, No. E2011-01907-CCA-R3-CD, 2013 WL 5775832, at *1, 4, 5 (Tenn. Crim. App. Oct. 24, 2013) ("*Roberson I*").

Petitioner, a state prisoner proceeding pro se, seeks habeas corpus relief under 28 U.S.C. § 2254 from these convictions based on his claims that (1) the police violated his Fourth Amendment rights by detaining him and searching and seizing his property prior to obtaining a warrant [Doc. 21, pp. 9, 20–51]; (2) the indictment failed to adequately allege especially aggravated kidnapping, the evidence was insufficient to support his

1

aggravated kidnapping conviction, and the trial court violated his due process rights by not properly instructing the jury regarding this charge [*Id.* at 9, 52–59]; (3) his trial counsel was ineffective in various ways [*Id.* at 9, 61–77]; (4) the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) [*Id.* at 78–82; Doc. 10-7, p. 26]; and (5) the prosecution violated the *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972) line of cases [Doc. 21, pp. 87–89]. Respondent filed a response in opposition to the petition [Doc. 22] and the state court record [Doc. 10]. Petitioner filed a reply [Doc. 25].

After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief. Accordingly, the Court will not hold an evidentiary hearing, *see* Rules Governing § 2254 Cases, Rule 8(a), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I. BACKGROUND

On August 7, 2008, at approximately 2:00 a.m., Chattanooga police received a report of a suspicious vehicle in an area near Centennial Drive [Doc. 10-1, p. 33]. When an officer responded to that call, he observed a black BMW that was registered to Petitioner at 1755 Varner Road, which was not in the area near Centennial Drive, where the car was located [*Id.*].

At approximately 5:00 a.m. on August 7, 2008, Chattanooga police officers responded to a report of a rape at a house on Centennial Drive [*Id.* at 32]. The rape victim told police that while she was house sitting at the Centennial Drive house, she was awakened by the dog barking and saw a male standing in the room where she was

sleeping [*Id.*]. The man hit her, bound her with duct tape, told her he had guns, asked where the safe was, left the room, returned to the room, raped her, took her car keys, and stole her car [*Id.*]. The victim's car was later found parked near where the police officer had seen Petitioner's BMW earlier in the night [*Id.*].

A few hours later, police learned that Petitioner was the cousin of Wayne Ledford, who was supervising construction at the Centennial Drive house where the rape and robbery occurred. *Roberson I*, at *8. That afternoon, police went to Petitioner's home, which had a five-foot picket fence lined with Bradford pear trees across the front, a driveway that "ran down the right side of the house to the back where the garage was located," and overgrown shrubbery around the sides. *Id.* at *2. Petitioner's BMW was in the garage, and a recreational vehicle ("RV") was in the backyard. *Id.*

Petitioner's grandfather saw police officers "milling around" outside the house at approximately 1:30 p.m. *Id.* At some point after their arrival, police placed Petitioner in a police car, and police accompanied Petitioner's grandfather while he changed his clothes before leaving the house to pick up Petitioner's daughter from school. *Id.*

After a police officer set forth information about the suspicious vehicle call, the victim's statements about what occurred at the Centennial Drive house from above, and Petitioner's BMW and an RV being located at the Varner Road address, among other things, in an affidavit, a judge issued a warrant authorizing search and seizure of various things, including (1) Petitioner; (2) Petitioner's DNA, hair, blood, photos, prints, and saliva; and (3) Petitioner's residence and various vehicles located there, including the RV, on August 7, 2008, at 8:44 p.m. [*Id.* at 32–34]. After issuance of this warrant, police

3

took a DNA sample from Petitioner and swabbed his penis [Doc. 10-6, pp. 68, 113]. Police also recovered, among other things, Petitioner's cell phone, underwear from Petitioner's residence, and a number of items from Petitioner's vehicle, including crow bars, condoms, a roll of duct tape that appeared to match the duct tape used to bind the victim, a wide-brimmed hat, gloves, a fanny pack, a small light that attached to a gun, and guns [*See, e.g.*, Doc. 10-15, pp. 27–31; Doc. 10-6, p. 35; Doc. 10-7, pp. 28–32, 112–15].

A grand jury indicted Petitioner for various charges arising from the rape and robbery incident at the Centennial Drive house [Doc. 10-1, pp. 4–12]. As to the aggravated kidnapping charge, the indictment alleged in relevant part that Petitioner "unlawfully and knowingly . . . confine[d] [the victim] . . . with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" [*Id.* at 5].

During the criminal proceeding against Petitioner, his counsel filed a motion to suppress all evidence police obtained in their search of Petitioner's residence and car [*Id.* at 85–106] and a supplement to that motion [*Id.* at 107–114]. After holding a hearing on the motion to suppress, during which, in relevant part, (1) the trial court expressed its opinion that it saw no issue with the police search of Petitioner's home and property after obtaining the warrant prior to hearing the proof [Doc. 10-4, p. 13], and (2) the prosecution did not present any witnesses [*See generally id.*], the trial court overruled the motion [*Id.* at 46–47].

Petitioner proceeded to a jury trial [Docs. 10-5–10-8]. During Petitioner's trial, his counsel told the jury in his opening statement that the evidence would demonstrate that someone other than Petitioner committed the crimes [Doc. 10-5, pp. 12–15]. Petitioner's trial counsel chose this strategy after investigating other possible defenses that he found were less plausible [Doc. 10-29, pp. 73–76]. In support of this theory, Petitioner's counsel repeatedly attempted to and did elicit testimony from various witnesses about, among other things, Mr. Ledford's (1) familiarity with the house and neighborhood where the incident occurred and (2) financial difficulties around the time of the rape and robbery incident [*See, e.g.*, Doc. 10-5, pp. 97, 103, 107–108, 115, 131, 144, 146, 148–49; Doc. 10-7, pp. 88–96].

At trial, the victim testified that the dog woke her by barking at 4:00 a.m., at which point she realized a man was in her room [Doc. 10-5, pp. 64–65]. After the man walked around the bedroom carrying an item with a light on it, he hit her several times with a hard object [*Id.* at 65–66] and told her "he had . . . several guns and he would use them" [*Id.* at 71]. The victim also testified that the man left the room after binding her hands and feet with duct tape, found the safe in a manner that resulted in "banging and hammering," later returned to the room to rape her, and again left the room after raping her but then quickly returned and took her money, car keys, and car, among other things, before leaving the house [*Id.* at 66, 70–72]. Police later found the victim's car parked "directly behind" where Petitioner's car had been parked when the officer responded to the suspicious vehicle call [*Id.* at 31–34].

The victim also testified in relevant part that (1) her assailant wore, among other things, gloves, a wide brimmed hat, and a fanny pack, (2) a hat police found in Petitioner's car looked like the hat her assailant had worn, and (3) the gloves police found in Petitioner's car felt the same as the gloves her assailant had worn [*Id.* at 66–69]. The victim further testified that the duct tape from Petitioner's car looked like the duct tape used to bind her [*Id.* at 69].

A police officer who gathered evidence from the victim's car and Petitioner's home stated that he (1) bagged the victim's bag, driver's license, and checkbook in the same bag and (2) bagged two pairs of Petitioner's underwear that he found "piled together" in Petitioner's room in the same bag, even though storing such evidence together was not ideal for purposes of DNA testing [Doc. 10-6, pp. 105, 113, 118–121]. DNA testing performed on a pair of the victim's underwear submitted for testing contained DNA from a male that was not Petitioner, and one pair of Petitioner's underwear had DNA from a female that was not the victim [Doc. 10-7, p. 129]. However, Petitioner was a major contributor to DNA taken from the gloves police found in his car, and the victim could not be ruled out as a minor contributor to the DNA on those gloves [*Id.* at 131]. Also, DNA taken from the fly of two pairs of Petitioner's underwear had the victim as a major contributor, and Petitioner as a minor contributor [*Id.* at 138–141].

A police officer who had taken a class regarding cell phone records analysis testified that Petitioner's cell phone records indicated that his phone transmitted information from three towers located near the Centennial Drive house for several hours

before the robbery and rape incident, and that the phone was turned off from 3:58 to 4:23 a.m. [Doc. 10-7, pp. 51–68].

Police officers, including Officer Heather Stone, testified that they did not search Petitioner's car or residence until after the judge had signed the warrant allowing them to do so [*See, e.g.*, Doc. 10-6, p. 83; Doc. 10-7, pp. 23, 50]. Officer Stone specifically testified that she left the Centennial Drive house at approximately 2:00 p.m., at which point she headed back to her office in Amnicola to secure the Centennial Drive house evidence, and that she was still at her office at approximately 9:00 p.m. when she learned that the judge had issued the search warrant [Doc. 10-6, pp. 25–26].

However, some notations on inventory documents admitted as an exhibit at Petitioner's trial regarding evidentiary items from Petitioner's car gathered by Officer Stone indicate that she obtained that evidence prior the judge signing the warrant [Doc. 10-15, p. 30 (items 79–81)]. Also, some handwritten notes from Officer Stone regarding the execution of the search warrant state that she gathered some items from Petitioner's car between 5:28 and 7:42 p.m. on an unspecified date [Doc. 10-7, pp. 26–27; Doc. 10-15, p. 93].

After the trial, the jury convicted Petitioner of all charges [Doc. 10-1, pp. 116, 122–29]. Prior to his sentencing, the prosecution offered Petitioner a deal under which they would agree to a sentence of 15 to 20 years if he assisted with recovery of the jewelry and the safe [Doc. 10-29, pp. 34–35, 73]. Petitioner testified that he asked his counsel for this agreement in writing, planned to "make every effort" to recover the

7

jewelry, and would have taken the agreement, but Petitioner's counsel testified that Petitioner indicated that did not want to take this deal [*Id.*].

Petitioner appealed his convictions, and the Tennessee Court of Criminal Appeals ("TCCA") reduced his conviction for theft of property valued over $60,000 to theft of property valued over $10,000 but otherwise affirmed his convictions. *Roberson I*.

Petitioner then filed a pro se petition for post-conviction relief [Doc. 10-27, pp. 4–21], and his appointed counsel filed three supplements to the petition [*Id.* at 68–71, 83–91, 97]. However, at the hearing on the petition, Petitioner and his counsel indicated that they were only pursuing the claims from the second amended petition and the claim regarding plea negotiations [Doc. 10-29, pp. 5–9, 13]. After a hearing [*Id.*], the post-conviction court denied Petitioner relief [Doc. 10-27, pp. 89–142], and the TCCA affirmed. *Roberson v. State*, E2020-00643-CCA-R3-PC, 2021 WL 2373819 (Tenn. Crim. App. June 9, 2021) ("*Roberson II*").

Petitioner next filed this action seeking relief under § 2254 [Doc. 2], and subsequently filed an amended petition for § 2254 relief that is now before the Court [Doc. 21].

## II.    STANDARD OF REVIEW

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to issue a writ of habeas corpus upon a determination that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). This Court may grant habeas corpus relief on a claim adjudicated on the merits in a state court

8

only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1), (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal courts may grant relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). And habeas corpus relief may be granted under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." (citing *Williams*, 529 U.S. at 410)). Rather, this Court may grant relief for a claim the state court decided on its merits only where the ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted his available state remedies for the claim. 28 U.S.C. § 2254(b)(1);

Case 3:21-cv-00305-TAV-JEM   Document 27   Filed 07/10/24   Page 9 of 41   PageID #: 2887

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). Fair presentation means that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state and the federal courts. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39.

If a prisoner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). In such circumstances, the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the

state courts and no state remedy remains available, the issue is procedurally defaulted"). Tennessee petitioners may generally proceed through only one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule). A federal district court may review a procedurally defaulted habeas corpus claim only where the petitioner shows cause for his default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50.

## III. ANALYSIS

### A. Fourth Amendment

As set forth above, in his amended petition, Petitioner seeks to assert a claim for violation of his Fourth Amendment rights arising from the police detaining him and searching and seizing his property without a warrant [Doc. 21, pp. 9, 32–51]. However, Respondent asserts that this claim is not cognizable in this action because the state courts provided Petitioner with the opportunity to litigate this claim, relying on *Stone v. Powell*, 428 U.S. 465, 494–95 (1976) [Doc. 22, pp. 25–26]. In his reply, Petitioner asserts that *Stone* is (1) inapplicable to this case and (2) no longer good law after passage of the AEDPA [Doc. 25, pp. 15–43].

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. However, "[b]ecause questions regarding the admissibility of otherwise relevant evidence seldom touch upon the 'basic justice' of a conviction, the Supreme Court bars Fourth Amendment claims from habeas review." *Northrop v.*

11

*Trippett*, 265 F.3d 372, 378 (6th Cir. 2001) (citing *Kuhlmann v. Wilson*, 477 U.S. 436, 447 (1986) and *Stone*, 428 U.S. at 494–95). Specifically, the Supreme Court has held that a habeas petitioner may not seek relief for a claim of illegal search or seizure or arrest if he had a full and fair opportunity to raise the claim in state court. *Stone*, 428 U.S. at 494–95.

The Sixth Circuit has set forth two inquiries a court must perform in deciding whether a petitioner may raise a Fourth Amendment claim in a habeas corpus action. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). First, the "court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a [F]ourth [A]mendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id.* (citation and internal citation omitted). The first inquiry focuses only on whether there is "an available avenue for the prisoner to present his claim to the state courts, not . . . the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013). "In the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedures for resolving the claim." *Id.* Accordingly, where a habeas petitioner had the opportunity to present his Fourth Amendment claim to both the trial and the appellate state courts, who both rejected it, the Sixth Circuit found that was a straightforward case where *Stone* prohibited further inquiry. *Id.* at 640.

This case is substantively similar to *Good*, as Tennessee provided Petitioner the ability to present his Fourth Amendment claim to the state trial and appellate courts, and Petitioner did so. Specifically, Petitioner filed a motion to suppress the evidence the police gathered with the trial court [Doc. 10-1, pp. 85–106, 107–114]. The trial court held a hearing on that motion [Doc. 10-4] before denying it [*Id.* at 46–47]. Petitioner then presented the claim to the TCCA [Doc. 10-20, pp. 64–77], which also found it had no merit. *Roberson I*, at *13–16.

Petitioner seeks to avoid application of *Stone* by (1) challenging the adequacy of the procedures used to examine this claim,[1] [Doc. 21, pp. 30–31], (2) asserting that alleged inadequacies in the state court proceedings on this claim mean that *Stone* does not apply [Doc. 25, pp. 17–29], and (3) asserting that *Stone* is no longer good law due to the AEDPA [*Id.* at 29–43]. However, the Court finds these arguments unpersuasive, as (1) the record demonstrates that the state court proceedings regarding Petitioner's Fourth Amendment claim were not a sham; (2) Petitioner's underlying state court proceedings on his Fourth Amendment claim were at least as thorough as those in *Good*, and (3) the Sixth Circuit has applied *Stone* after passage of the AEDPA. *See, e.g.*, *id*. Accordingly, *Stone* prohibits the Court from addressing the merits of Petitioner's Fourth Amendment claim, and Petitioner is not entitled to relief under § 2254 for this claim.

---

[1] Petitioner's argument that the state court procedures to examine this claim were inadequate rests mainly on his assertions that (1) the trial court improperly stated that it disagreed with the arguments in the motion to suppress prior to presentation of the evidence at the hearing on that motion and (2) the prosecution failed to present any evidence at that hearing despite having the burden to show that a warrantless search was appropriate under the circumstances [Doc. 21, pp. 30–31].

13

## B.     Aggravated Kidnapping

Petitioner next asserts that (1) the indictment failed to adequately allege the serious bodily injury element of the aggravated kidnapping charge; (2) the evidence was insufficient to support his aggravated kidnapping conviction, as it did not demonstrate that the victim incurred a serious bodily injury or that Petitioner used a deadly weapon in committing this crime; (3) the evidence failed to establish that his confinement of the victim was more than necessary to accomplish the accompanying felonies; and (4) the trial court's jury instructions failed to adequately instruct the jury on the aggravated kidnapping charge [Doc. 21, pp. 52–59].  The Court will address these claims in turn based on their substance.

### 1.  Serious Bodily Injury and Deadly Weapon

As set forth above, Petitioner asserts that the indictment failed to properly allege the charge of aggravated kidnapping because it did not include an allegation that the victim incurred serious bodily, and that the evidence was insufficient to this conviction because it did not demonstrate that the victim incurred serious bodily injury, that Petitioner used a deadly weapon to accomplish this offense, or that the aggravated kidnapping was not incidental to the other felonies [*Id.* at 52–55].  Petitioner presented these claims in his direct appeal to the TCCA [Doc. 10-20, pp. 51–55], which addressed them as follows:

> The Defendant asserts that serious bodily injury is an essential element of the criminal offense of especially aggravated kidnapping.  The Defendant argues that the indictment charging him with especially aggravated kidnapping does not allege serious bodily injury and that the State failed to present any evidence at trial of serious bodily injury to the victim.  He

14

argues that the State also failed to present evidence that the Defendant used a deadly weapon to accomplish the kidnapping. Finally, he argues that the evidence is insufficient to establish kidnapping because the confinement was incidental to the burglary.

Tennessee Code Annotated section 39–13–305(a) defines the offense of especially aggravated kidnapping as follows:

> (a) Especially aggravated kidnapping is false imprisonment, as defined in § 39–13–302:
>
> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; [*or* ]
>
> (2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement; [*or* ]
>
> (3) Committed to hold the victim for ransom or reward, or as a shield or hostage; *or*
>
> (4) Where the victim suffers serious bodily injury.
>
> (b)(1) Especially aggravated kidnapping is a Class A felony.

(emphasis added). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39–13–302 (2010).

We first note that the statutory elements of especially aggravated kidnapping are listed in the alternative, thus, the State was not required to prove both serious bodily injury and use of a deadly weapon. Rather, the State was required to show one of the listed elements. As the Defendant correctly notes, the indictment does not allege serious bodily injury. The indictment does, however, allege that the Defendant unlawfully and knowingly confined the victim with the use of a deadly weapon or "by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* Therefore, we will review the evidence supporting this conviction accordingly.

The evidence, viewed in the light most favorable to the State, shows that the Defendant entered the house where the victim was "house sitting" and

ordered her to put down her cell phone. He then hit the victim in the face with a hard object and bound her hands and feet with duct tape. The Defendant told the victim he had guns and would use them. The Defendant left the victim helpless to free herself or seek help while he forcibly removed the homeowner's safe from the upstairs master bedroom. Upon completing this task, he returned to the room where the victim was bound and raped the victim both anally and vaginally. After raping her, he took her driver's license from her wallet and threatened to find her if she contacted police. After leaving the victim, he returned, took her car key, and drove her vehicle a short distance from the house before abandoning it.

Based upon this evidence, a rational juror could find that the Defendant knowingly confined the victim unlawfully in the bedroom by binding her hands and feet with duct tape, thus interfering substantially with the victim's liberty. The Defendant argues that the State did not prove that the Defendant accomplished the false imprisonment with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. We respectfully disagree. The victim testified to seeing a small light emanating from an object in the Defendant's hand. The police later found, in the Defendant's car, a small light that attaches to the barrel of a pistol. The small light was found near a pistol wrapped in a shirt. The Defendant repeatedly hit the victim with the hard object in his hand that projected a small light until she released her cellular phone as he had commanded her to do. This conduct by the Defendant resulted in marks and swelling on the victim's face. The Defendant told the victim he had guns and would use them. We conclude that this is sufficient evidence upon which a jury could find the Defendant accomplished the kidnapping with a deadly weapon.

*Roberson I*, at *17–18.

Petitioner has not shown that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. As the TCCA noted, it is apparent from the plain language of the aggravated kidnapping statute that the four elements of aggravated kidnapping, including

16

accomplishment of the crime with a deadly weapon and the victim's serious bodily injury, listed under Tenn. Code Ann. 39-13-305(a) were not all mandatory elements, as they are listed in the alternative. As such, the indictment did not have to allege, and the prosecution did not have to prove, that the victim suffered a serious bodily injury to adequately allege and prove that Petitioner committed aggravated kidnapping, as long as the indictment alleged and the state proved that Petitioner accomplished that crime through use of a deadly weapon (or any of the other relevant elements). And the record establishes that they did so. Specifically, as set forth above, the indictment alleges that Petitioner used a deadly weapon in subduing the victim [Doc. 10-1, p. 5]. And viewing the evidence in the light most favorable to the prosecution, the state proved that Petitioner used a deadly weapon or an article Petitioner intended the victim to believe was a deadly weapon to accomplish the especially aggravated kidnapping offense, as the victim testified that her assailant (1) carried an object with a small light on it, (2) her with a hard object, and (3) told her that "he had . . . several guns and he would use them" [Doc. 10-5, pp. 65–66, 71], and the police found a small light that attached to a gun in Petitioner's car [Doc. 10-6, p. 35]. Accordingly, Petitioner has not demonstrated that he is entitled to relief under § 2254 for these claims.

### 2. Incidental Nature of Confinement

Petitioner also asserts that the evidence was insufficient to support the aggravated kidnapping charge because it did not establish that his confinement of the victim was more than necessary to accomplish the acts underlying his other felony convictions, and the trial court therefore failed to properly instruct the jury regarding the aggravated

17

kidnapping charge [Doc. 21, pp. 56–59]. Petitioner presented these claims to the TCCA

in his direct appeal [Doc. 10-20, pp. 54–55]. The TCCA addressed them as follows:

> The trial court instructed the jury on especially aggravated kidnapping and
> the lesser included offenses of aggravated kidnapping, kidnapping, and
> false imprisonment. Regarding the aggravated kidnapping instruction, the
> trial court stated as follows:
>
>> For you to find the defendant guilty of this offense the state
>> must have proven beyond a reasonable doubt the existence of
>> the following essential elements. One, that the defendant
>> removed or confined another unlawfully [so] as to interfere
>> substantially with the other's liberty; and two, that the
>> confinement or removal was accomplished with a deadly
>> weapon or by display of any article used or fashioned to lead
>> the alleged victim to reasonably believe it was a deadly
>> weapon, and three the defendant acted knowingly. A removal
>> or confinement is unlawful if it is accomplished by force,
>> threat or fraud.
>
> A trial court has the duty, in criminal cases, to fully instruct the jury on the
> general principles of law relevant to the issues raised by the evidence. *See
> State v. Burns*, 6 S.W.3d 453, 464 (Tenn.1999); *State v. Harbison*, 704
> S.W.2d 314, 319 (Tenn.1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn.
> Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the
> law'" satisfies a defendant's constitutional right to trial by jury. *State v.
> Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v.
> McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the
> trial court must instruct the jury on those principles closely and openly
> connected with the facts before the court, which are necessary for the
> jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because
> questions regarding the propriety of jury instructions are mixed questions
> of law and fact, our standard of review here is *de novo*, with no
> presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn.
> 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).
>
> "A defendant has a constitutional right to a correct and complete charge of
> the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990), *super[s]eded*

18

*by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). With this in mind, we turn to the Defendant's claims with regard to his jury instructions.

\*     \*     \*

[T]he Defendant relies on *State v. White* in his assertion that he deserves a new trial because the trial court failed to specifically instruct the jury on the term "substantial interference." In *State v. White*, our Supreme Court held that trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony. *White*, 362 S.W.3d at 578. Our Supreme Court further opined that whether removal or confinement was or was not essentially incidental to an accompanying "offense" is a jury question, to be reviewed by the appellate courts under a sufficiency of the evidence standard. *Id.* The Supreme Court held that, to protect the defendant's due process rights, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to

19

support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *Id.* The Supreme Court also developed a jury instruction to be provided to facilitate the jury's determination of whether the removal or confinement was essentially incidental to the accompanying offense:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580–81; *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01–.03, 8.05 (footnote omitted) (citing *White*, 362 S.W.3d at 578–81).

Under *White,* an instruction is required if the proof "fairly raised" a question of whether there was a kidnapping offense separate from the

accompanying felony, or as in this case, felonies. *See State v. Bennie Osby*, No. W2012–00408–CCA–R3–CD, slip op. at 8 (Tenn. Crim. App. Nov. 2, 2012), *perm. app. Filed* (Tenn. Dec. 11, 2012). The same instructional error that existed in *White* is present in this case—the jury was not adequately charged on the question of whether the victim's removal or confinement, as an element of especially aggravated kidnapping, was essentially incidental to the aggravated rapes or the aggravated robbery of the victim. In consequence, the lack of the instruction set out in *White,* while entirely understandable because the trial in this case predated the Supreme Court's ruling in *White,* is constitutional error. We, therefore, consider whether the error was harmless beyond a reasonable doubt.

The facts support a conclusion that the Defendant's continued restraint of the victim was not in order to accomplish the rape, which had already occurred, nor was it inherent in the then-completed robbery. We note that kidnapping is a continuous crime. *State v. Legg*, 9 S.W.3d 111, 117 (Tenn. 1999) ("[A]n act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime [of kidnapping] at every moment the victim's liberty is taken."); *see State v. Campbell*, 245 S.W.3d 331, 337 (Tenn. 2008) (noting the Court's conclusion in *Legg* that the crime of kidnapping "continued until [the victim's] liberty was restored"). This Court has taken an expansive view of kidnapping. *See State v. Evangeline Combs and Joseph D. Combs*, Nos. E2000–02801–CCAR3–CD and E2000–02800–CCA–R3–CD (Tenn. Crim. App. Sept. 25, 2002) (stating in a case involving kidnapping arising from seven years of enslavement and torture, "we reject the Defendants' argument that no confinement was proved because she escaped on three occasions and voluntarily returned twice"), *perm. app. Denied* (Tenn. Jan. 27, 2003). Here, the Defendant completed the robbery, and rapes of the victim, who was restrained with duct tape. The Defendant had bound the victim, isolated her from her phone, and left her restrained in the Lebovitz home while he left for a period of time. The Defendant later returned, took the victim's car keys, stole the victim's car, and abandoned the car a short distance away, presumably to prevent the victim from summoning help. These acts constitute confinement that was clearly beyond what was necessary to accomplish the accompanying offenses. We conclude that the

21

lack of the *White* instruction was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

*Roberson I*, at *24–26.

First, the Court finds that Petitioner's claim challenging the trial court's failure to use the *White* jury instruction is not cognizable herein. Specifically, in his direct appeal, Petitioner raised this claim to the TCCA by asserting the trial court erred by not using the *White* jury instruction because the Tennessee Supreme Court held in *White* that (1) "the legislature did NOT intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony such as rape or robbery," (2) this issue is a question for the jury to answer based on a specific jury instruction not given in Petitioner's trial, and (3) "appellate courts are to review [the *White* jury instruction issue] under the sufficiency of the evidence standard as the due process safeguard" [Doc. 10-20, pp. 54, 78–79]. Petitioner also noted that, in *White*, the Supreme Court found that the defendant was entitled to a new trial due to the failure to give the appropriate jury instruction, set forth the *White* jury instruction, and asserted that his aggravated kidnapping conviction could not stand due to the trial court's failure to give this jury instruction [*Id.* at 79–80].

Thus, although Petitioner raised the *White* jury instruction claim in his direct appeal, he did not raise it as a federal constitutional claim. While Petitioner generally referenced "due process" in his direct appeal jury instruction claim, this insufficient to raise a federal constitutional claim. *Gray*, 518 U.S. at 162–63 ("We have . . . indicated that it is not enough to make a general appeal to a constitutional guarantee as broad as

due process to present the 'substance' of such a claim to a state court."); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding "general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated") (citation and internal quotation marks omitted).

Moreover, Petitioner's reliance on *White* in his direct appeal is not sufficient to raise a constitutional claim, as *White* announced a state law rule, not a federal constitutional rule. *Hubbard v. Lebo*, No. 217CV02452TLPTMP, 2020 WL 5753199, at *11–12 (W.D. Tenn. Sept. 25, 2020) (finding that where the petitioner presented his *White* jury instruction claim to the state courts as an error of state law and failed to cite any Supreme Court law to support his assertion that the trial court should have instructed the jury using the *White* instruction even though *White* had not been decided at the time of his trial, his claim was not cognizable for habeas corpus review) (collecting cases) (citations omitted).[2]  Accordingly, Petitioner did not fairly present this claim to the TCCA as a constitutional claim, he cannot do so here for the first time, and this claim is not cognizable in this action. *Wagner*, 581 F.3d at 418.

Additionally, the Court finds that, to the extent this claim is cognizable herein, Petitioner has not shown that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented.  Notably, a claim that a jury instruction violated state law is generally not an appropriate issue in federal habeas corpus actions.  *Estelle v. McGuire*, 502 U.S.

---

[2] Petitioner also raised this claim to the TCCA in his post-conviction appeal as a due process claim [Doc. 10-30, pp. 22–24].  But the TCCA found that he had already litigated the claim in his direct appeal, and it therefore could not address it on the merits. *Roberson II*, at *18.

23

62, 68, 71–72 (1991) (providing that the issue of whether a jury instruction violated state law is generally not a proper subject for federal habeas review). "The only exception is when a defective jury instruction 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Alston v. Genovese*, No. 20-5038, 2020 WL 3960581, at *2 (6th Cir. June 9, 2020) (quoting *Estelle*, 502 U.S. at 72).

As set forth above, the TCCA found that the trial court's failure to give the *White* jury instruction was harmless beyond a reasonable doubt. *Roberson I*, at *26. The TCCA based this holding primarily on its findings that (1) under Tennessee law, kidnapping is a continuous crime that a defendant commits each moment he leaves a victim confined, and (2) after he had completed the robbery of the safe and the rapes of the victim, Petitioner left the victim alone for a period of time before returning take her keys and her car, which the TCCA presumed was to prevent the victim from obtaining assistance. *Id.*

The Court does note that the TCCA's reasoning on this issue does not directly address the fact that Petitioner had not completed his felony theft of the victim's car during the brief time he left her confined before coming back to obtain her keys to take her car, of which he was convicted separately. *Id.* at *4–5, 18–19. However, given the TCCA's emphasis on both (1) the fact that kidnapping is a continuous crime under Tennessee law and (2) the fact that Petitioner left the victim in the room for a brief period of time after completing the robbery of the safe and the rapes and before he returned to room to commit the acts necessary for theft of the victim's car, the Court cannot find that the TCCA's finding that Petitioner's confinement of the victim was more than what was

24

necessary to accomplish his accompanying offenses was an unreasonable determination of the facts that lacked any justification, or that the trial court's failure to give the *White* instruction so infected Petitioner's trial that it resulted in a violation of Petitioner's federal due process rights. Nor can the Court find that the evidence was insufficient to support Petitioner's aggravated kidnapping conviction under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that the evidence is sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### C.     Ineffective Assistance of Counsel

In his § 2254 petition, Petitioner sets forth a number of ineffective assistance of counsel claims, which the Court summarizes as follows:

(1)    Trial counsel improperly stated in his opening statement that the evidence would show that someone other than Petitioner committed the offenses [Doc. 10-21, pp. 61–62];

(2)    Trial counsel was ineffective for abandoning sentencing negotiations [*Id.* at 62–63];

(3)    Trial counsel failed to investigate and request DNA and lubrication testing on various objects [*Id.* at 63–66];

(4)    Trial counsel failed to retain an expert and purse a claim regarding contamination of evidence [*Id.* at 66–72];

(5)    Trial counsel failed to exclude evidence regarding Petitioner's tools and pry markings [*Id.* at 72];

(6)    Trial counsel failed to investigate and retain an expert regarding cellular towers [*Id.* at 72–76];

(7)     Trial counsel failed to conduct a voice line up [*Id.* at 76–77]; and

(8)     Trial counsel failed to move to exclude evidence regarding the duct tape evidence found in Petitioner's car [*Id.* at 77].

The Court will address these claims in turn based on their substance.

### 1.     Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party claiming ineffective assistance must "identify the acts or omissions

of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim must be rejected. *Strickland*, 466 U.S. at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 2. Opening Statement

Petitioner claims that his counsel was ineffective for telling the jury that the proof would show that someone else was responsible for the crimes in his opening statement, as his counsel did not then present any such evidence at trial [*Id.* at 61–62]. Petitioner presented this claim to the TCCA in his post-conviction appeal [Doc. 10-30, pp. 11–14]. The TCCA denied it because Petitioner's counsel had elicited proof at trial to support his assertion that the evidence would show that someone else committed the crimes, but the

27

jury instead found that Petitioner had committed the crimes. *Roberson II*, at \*14. The Court agrees with the TCCA.

As set forth above, the record demonstrates that Petitioner's counsel repeatedly attempted to convince the jury that Petitioner's cousin, Mr. Ledford, was responsible for the crimes. The record further shows that Petitioner's trial counsel chose this strategy after investigating other possible defenses Petitioner presented to his counsel, but which counsel found less plausible [Doc. 10-29, pp. 73–76]. The fact that this strategy was unsuccessful does not make it unreasonable. *Strickland*, 466 U.S. at 690–91 (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Petitioner has not overcome the strong presumption that his counsel's opening statement was a sound trial strategy. *Id.* at 689.

Accordingly, Petitioner is not entitled to § 2254 relief on this claim.

### 3. Sentencing Negotiations

Petitioner next claims that his trial counsel was ineffective for abandoning negotiations regarding a lesser sentence for Petitioner [Doc. 10-21, pp. 62–63]. Petitioner raised this claim to the TCCA in his post-conviction appeal [Doc. 10-30, pp. 12–13], and the TCCA denied it because Petitioner had not presented proof that he could meet the conditions of the proposed sentencing agreement. *Roberson II*, at \*15. Again, the Court agrees with the TCCA.

The *Strickland* standard applies to claims alleging counsel was ineffective with regard to a plea offer. *See Lafler v. Cooper*, 566 U.S. 156 (2012). To demonstrate prejudice in this context, the petitioner must establish a reasonable probability the offer

28

would have been accepted if counsel had performed effectively. *Id*. at 164. Specifically, the petitioner must establish:

> [T]hat but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id*.

Petitioner has not met this burden. Specifically, as set forth above, the proof at the post-conviction evidentiary hearing demonstrates that prior to Petitioner's sentencing, the prosecution offered Petitioner an agreement under which the parties would agree to a sentence of 15 to 20 years for Petitioner, if he assisted with recovery of the jewelry and the safe [Doc. 10-29, pp. 34–35, 73]. But while Petitioner testified that he asked his counsel for this agreement in writing, planned to "make every effort" to recover the jewelry, and would have taken the agreement, his counsel testified that Petitioner indicated that did not want to take this deal [*Id.*]. And as the TCCA correctly noted, Petitioner did not present any proof that he could have assisted with recovery of the jewelry, such that the parties would have presented this agreement to the court.

Accordingly, Petitioner has not shown that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and Petitioner is not entitled to relief under § 2254 for this claim.

### 4.     DNA and Lubrication Testing

Petitioner next claims that his trial counsel was ineffective for failing to investigate and request further DNA testing of several things, including his cell phone, flashlights, and firearms, and condom lubricant testing of various items, including his penis, the bedding and comforter, the victim's clothes, and the gloves [Doc. 21, pp. 63–66].  Petitioner presented this claim to the TCCA in his post-conviction appeal [Doc. 10-30, pp. 13–14], and the TCCA denied it on the ground that Petitioner had not presented any proof that that such testing would have changed the result of his trial. *Roberson II*, at *15.

Petitioner has not demonstrated that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented.  To the contrary, the record demonstrates that Petitioner has never shown that any additional DNA or lubricant testing would have changed the trial's outcome.  This is especially true because, even if the Court assumes that the DNA and lubricant testing Petitioner asserts that his counsel should have requested would have been favorable to him, the Court cannot find that the test results would have changed the result of Petitioner's trial in light of the other overwhelming evidence of Petitioner's guilt.  Accordingly, the Court cannot find that Petitioner suffered any prejudice due to his counsel's failure to request this testing, and he is not entitled to relief under § 2254 for this claim.

### 5. Cross Contamination and Cell Tower Experts

In Petitioner's ineffective assistance of counsel claims numbered (4) and (6), he challenges his trial counsel's failure to obtain experts regarding cross contamination of evidence and cell tower evidence presented at his trial, as well as his trial counsel's failure to try seek exclusion of this evidence from his trial [Doc. 21, pp. 66–76]. Petitioner presented these claims to the TCCA in his post-conviction appeal [Doc. 10-30, pp. 16–17, 18–19]. The TCCA denied the claims regarding counsel's failure to present experts on these issues because Petitioner did not set forth any expert witness testimony to demonstrate that his counsel's failure to present such evidence amounted to ineffective assistance. *Roberson II*, at *16. The TCCA rejected Petitioner's claim that his counsel should have objected to admission of the cell phone tower evidence because Petitioner did not show that any such objection would have been sustained, or that the result of his trial would have been different if the trial court had not admitted this evidence. *Id*. The TCCA did not address Petitioner's claim that his counsel should have objected to the allegedly contaminated DNA evidence.[3]

As Petitioner has failed to present any expert testimony in the areas of cellular towers or contaminated DNA evidence to show that his counsel's failure to present such evidence was deficient performance that prejudiced him, the TCCA reasonably rejected this claim. *See Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (finding that where a

---

[3] While the TCCA did not directly address Petitioner's claim that his counsel failed to seek to exclude the allegedly contaminated evidence items, "when a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 293 (2013).

petitioner did not present any evidence of what an uncalled witness's testimony might have been, the petitioner had not shown that his counsel's failure to call that witness had prejudiced him). Moreover, the record does not contain any legal basis or evidence to support the Court finding that, if Petitioner's counsel had attempted to exclude the allegedly contaminated DNA or cell tower evidence from his trial, he would have been successful, especially given the significant relevance of this evidence. Thus, the Court cannot find that Petitioner's counsel was deficient for not seeking exclusion of this evidence, or that the failure to seek exclusion of this evidence prejudiced Petitioner.

Accordingly, Petitioner has not demonstrated that the TCCA's denial of these claims on the merits was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and Petitioner is not entitled to relief under § 2254 for these claims.

### 6. Tool and Pry Markings

Petitioner next claims that his trial counsel was ineffective for failing to exclude evidence regarding tools from his car and pry markings from the crime scene, as the prosecution did not establish that his tools made the pry markings[4] [Doc. 21, p. 72]. Petitioner presented this claim to the TCCA in his post-conviction appeal [Doc. 10-30, pp. 17–18]. The TCCA denied this claim because the tools and pry mark evidence were

---

[4] Petitioner also mentions that his counsel did not present an expert witness on this issue [Doc. 21 p. 72]. However, to the extent that Petitioner seeks to assert a claim for ineffective assistance of counsel arising out of this omission, he again has failed to present any expert testimony on these issues to show that his counsel's failure to present such evidence was deficient performance that prejudiced him, and the TCCA reasonably rejected this claim. *Clark*, 490 F.3d at 551, 557.

relevant and admissible, and Petitioner had not shown that (1) if his counsel had objected, the evidence would have been excluded, or (2) the result of his trial would have been different if this evidence had been excluded, given the other evidence of his guilt. *Roberson II*, at \*16. The Court agrees. Petitioner has not set forth any legal basis for the trial court to have excluded the tools and/or pry markings, such that the Court could find that Petitioner's counsel was deficient for not seeking to exclude this evidence. Nor has Petitioner demonstrated that the result of his trial would have been different without this evidence. Thus, and Petitioner is not entitled to relief under § 2254 for this claim.

### 7. Voice Lineup

Petitioner also claims that his counsel was ineffective for not presenting a voice lineup for the victim to identify his voice [Doc. 21, pp. 76–77]. Petitioner presented this claim to the TCCA, which found it had no merit because Petitioner never presented any evidence that such a lineup would have been favorable to him. *Roberson II*, at \*17.

Petitioner has not demonstrated that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner has not set forth any proof that, if his counsel had presented the victim with a voice lineup, this evidence would have been favorable to him, such that it could have changed the result of his trial. *Clark*, 490 F.3d at 551, 557. Thus, this claim is purely speculative and has no merit. Accordingly, Petitioner is not entitled to § 2254 relief for this claim.

### 8. Duct Tape

Petitioner also claims that his counsel was ineffective for failing to seek exclusion of evidence that the duct tape in Petitioner's car matched the duct on the victim because the fracture lines from the duct tape in his car did not match the tape on the victim, and other testimony demonstrated that the duct tape was "too common" to be a match [Doc. 21, p. 77]. Petitioner presented this claim to the TCCA in his post-conviction appeal [Doc. 30, pp. 20–21]. The TCCA denied this claim because Petitioner presented no grounds for the trial court to have excluded the duct tape evidence, and Petitioner's counsel used another witness to discredit the testimony that the duct tape matched. *Roberson II*, at *16–17.

Petitioner has not demonstrated that the TCCA's denial of this claim was unreasonable. As the TCCA correctly noted, the duct tape evidence was relevant to Petitioner's criminal proceedings, and Petitioner's counsel attempted to, and did, introduce evidence that while the duct tape in Petitioner's car appeared to match the duct tape on the victim, the fracture lines did not match. Petitioner has not demonstrated that this was deficient performance, or that, even if the trial court had excluded the duct tape evidence, the result of his trial would have been different, especially in light of the other overwhelming evidence of his guilt. Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### D. *Brady*

Petitioner also claims that the prosecution violated *Brady* by failing to provide him with documents indicating that Officer Stone searched his car prior to issuance of the

34

search warrant [Doc. 21, pp. 78–82]. To support this claim, Petitioner relies on documents contained in two exhibits from his trial, specifically a page of an inventory of evidence his counsel introduced as an exhibit during his cross examination of Officer Stone [Doc. 10-6, p. 92; Doc. 10-15, p. 30] and handwritten notes from Officer Stone regarding her gathering of evidence from his car that his counsel introduced as an exhibit during his cross examination of Officer Alexis Mercado [Doc. 10-7, p. 26; Doc. 10-15, pp. 92–93]. However, as Petitioner has not demonstrated that the state suppressed these documents, he is not entitled to relief for this claim. Also, Petitioner failed to present this claim to the TCCA and cannot overcome his procedural default of this claim.

The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97). "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

To establish a *Brady* violation, a petitioner must show that the state withheld evidence that was material to his guilt or punishment. *Brady*, 373 U.S. at 87; *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (providing that a habeas petitioner has the burden of establishing that the state did not disclose evidence for purposes of a *Brady* claim). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

*Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted). However, no *Brady* violation exists if a defendant knew or had reason to know "'the essential facts permitting him to take advantage of any exculpatory information,'" or where the evidence was available to him from another source. *Abdur'Rahman v. Colson*, 649 F.3d 468, 474 (6th Cir. 2011), *cert. denied*, 133 S. Ct. 30 (2012) (quoting *United States v. Clark,* 928 F.2d 733, 738 (6th Cir. 1991)).

Where a petitioner did not raise a *Brady* claim in his underlying state court proceedings, he can overcome that procedural default by demonstrating that the state's suppression of the evidence caused his failure to develop the facts supporting this claim in his state court proceeding and "the suppressed evidence is 'material' for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)).

Petitioner has not set forth any evidence that the state did not provide the exhibits upon which he relies for his *Brady* claim to his counsel in his trial, direct appeal, and post-conviction proceedings, such that he could be entitled to relief under *Brady*. Moreover, as the documents upon which Petitioner relies for this claim were introduced as exhibits at his trial during his counsel's cross-examination of witnesses, it is apparent that Petitioner and his direct appeal and post-conviction counsel knew or should have known of the relevant facts that would have permitted them to assert the *Brady* claim arising out of those exhibits, especially as the trial court's denial of Petitioner's motion to

36

suppress was an issue that Petitioner raised in both his direct appeal and post-conviction appeal [Doc. 10-20, pp. 64–77; Doc. 10-30, pp. 27–29]. As such, Petitioner has not demonstrated that the state's alleged suppression of these documents prevented him from raising this *Brady* claim in his direct appeal and/or post-conviction proceedings, such that he could overcome his procedural default of this claim. *Abdur'Rahman*, 649 F.3d at 474; *Hutchison v. Bell*, 303 F.3d 720, 741–42 (6th Cir. 2002) (providing that where the petitioner possessed the allegedly exculpatory *Brady* materials before the start of a state post-conviction hearing, he could have raised the issue then, and he has not shown cause to excuse his procedural default). Accordingly, Petitioner is not entitled to relief under § 2254 for his *Brady* claim.

## E. *Napue/Giglio*

Petitioner lastly claims that the prosecution's reliance on police testimony that they did not search his property until after the judge signed a search warrant violated his constitutional rights under the *Napue/Giglio* line of cases, because that testimony conflicts with other evidence admitted at his trial [Doc. 21, pp. 83–89]. However, Petitioner procedurally defaulted this claim, and has not shown cause to overcome this default. Also, this claim has no merit.

First, Petitioner did not present this claim to the TCCA [Docs. 10-20, 10-30]. In his reply, Petitioner again attempts to excuse this procedural default by asserting that the state improperly suppressed this evidence [Doc. 25, p. 14]. As set forth above, however, the evidence upon which Petitioner relies for this claim was in exhibits introduced at his trial, and the record establishes that Petitioner was or should have been aware of the

factual basis for this claim when he filed both his direct appeal and his petition for post-conviction relief. As such, Petitioner has not set forth cause for the Court to excuse his procedural default of this claim, and the Court declines to do so.

This claim also has no merit. The Sixth Circuit has held that a false testimony claim under the *Napue*/*Giglio* line of cases requires Petitioner to show "(1) that the prosecution presented false testimony; (2) that the prosecution knew [the testimony] was false; and (3) that [the false testimony] was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005) (citing *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992)). Under this standard, false testimony is material, and "[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (alterations and internal quotation marks omitted) (quoting *Napue,* 360 U.S. at 271).

Petitioner first asserts that an evidence inventory that was an exhibit at his trial shows that Officer Stone searched his property on August 7, 2008, prior to the judge signing the warrant in a manner that conflicts with trial testimony [Doc. 21, p. 78 (citing Doc. 10-15, p. 30)]. Petitioner is correct that items 79 through 81 on the inventory on which he relies for this claim indicate that Officer Stone gathered evidentiary items from his property on August 7, 2008, prior to the judge signing the warrant at 8:44 p.m. [Doc. 10-15, p. 30 (items 79–81)]. Petitioner is further correct that this inventory document conflicts with police testimony at Petitioner's trial that they did not gather evidence from Petitioner's property until after the judge signed the warrant [*See, e.g.*, Doc. 10-6, p. 83; Doc. 10-7, pp. 23, 50]. The inventory also appears to conflict with Officer Stone's

38

testimony that she left the Centennial Drive house at approximately 2:00 p.m., at which point she headed back to her office in Amnicola to secure the Centennial Drive house evidence, and that she was still at her office at approximately 9:00 p.m. when she received word that the judge had issued the search warrant [Doc. 10-6, pp. 25–26].

Petitioner further claims Officer Stone's handwritten notes also indicate that police searched his vehicle prior to issuance of the warrant [Doc. 21, p. 78]. The first page of the exhibit from his trial upon which Petitioner appears to rely to support this statement is dated August 7, 2008, and the list of items on the second page of that document indicates that police gathered those items earlier than 8:44 p.m., which as set forth above is the time when the judge signed the warrant on August 7, 2008 [Doc. 10-15, pp. 92–93]. Notably, however, the first page of this exhibit states that it lists items the officers recovered in their execution of the warrant, and it thus does not appear to support Petitioner's allegation that police recovered the listed items before the judge issued the warrant [*Id.* at 92]. And while the handwritten notes on the second page of that document are undated [*Id.* at 93], the testimony at trial during which Petitioner's counsel admitted these handwritten notes clearly indicates that the handwritten notes were made pursuant to a search of Petitioner's BMW after it was taken to the police station after issuance of the warrant [Doc. 10-7, pp. 25–28]. Thus, the full context of these handwritten notes belies Petitioner's allegation that they support his assertion that police searched his property prior to the judge signing the warrant.

Nevertheless, Petitioner is correct that trial testimony about the timeline of when the police gathered evidence conflicts with at least one document introduced as an exhibit

at his trial. But this is insufficient to entitle Petitioner to relief under *Napue/Giglio*, as (1) Petitioner has not demonstrated that the trial testimony about the timeline of the search of Petitioner's property, rather than the date on the evidence inventory, was incorrect, and (2) Petitioner has not set forth any evidence suggesting that the state knew that any testimony at trial about when police searched Petitioner's property was false when it presented that testimony. To the contrary, the record suggests that it is just as, if not more, likely that the date on the inventory was a typographical error, such that police actually did not search Petitioner's property until after the judge issued the warrant, in accordance with their trial testimony. Accordingly, Petitioner has not demonstrated that he is entitled to § 2254 relief for this claim.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists could not debate the Court's conclusion that Petitioner procedurally defaulted his *Brady* and *Napue/Giglio* claims. Additionally, reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to the remainder of his claims that the Court addressed on the merits, such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE